**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| YOUNES HASSINE, derivatively on behalf of AMYLYX PHARMACEUTICALS, INC., | Case No.: 1:25-cv-11879 |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| JOSHUA B. COHEN, JUSTIN B. KLEE, JAMES M. FRATES, MARGARET OLINGER, KAREN FIRESTONE, GEORGE MCLEAN MILNE JR., PAUL FONTEYNE, AND DAPHNE QUIMI, | |
| Defendants, | |
| and | |
| AMYLYX PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Younes Hassine ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Amylyx Pharmaceuticals, Inc. ("Amylyx" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Joshua B. Cohen ("Cohen"), Justin B. Klee ("Klee"), James M. Frates ("Frates"), Margaret Olinger ("Olingr"), Karen Firestone ("Firestone"), George Mclean Milne Jr. ("Milne"), Paul Fonteyne ("Fonteyne"), and Daphne Quimi ("Quimi") (collectively, the "Individual Defendants," and together with Amylyx, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Amylyx, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants Cohen, Klee, Frates, and Olinger for contribution under Sections

10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amylyx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Amylyx's current and/or former directors and officers from November 11, 2022 through November 8, 2023, both dates inclusive (the "Relevant Period").

2.     Amylyx is a Delaware-incorporated commercial-stage biotechnology company purportedly focused on the discovery and development of treatments for amyotrophic lateral sclerosis ("ALS"), or Lou Gehrig's disease, as well as other neurodegenerative diseases. Among Amylyx's product portfolio is, *inter alia*, AMX0035 (marketed as "Relyvrio" in the U.S.) a dual UPR-Bax apoptosis inhibitor made up of sodium phenylbutyrate and taurursodiol, used for treating ALS in adults in the United States.

3.     In September 2022, the United States Food and Drug Administration ("FDA") approved Relyvrio for treatment of adults with ALS in the United States. Following the approval, the Defendants consistently promoted the drug's commercial potential and prescription rate growth.

4.    During the Relevant Period, however, the Individual Defendants, in breach of their fiduciary duties owed to Amylyx, willfully or recklessly made and/or caused the Company to make false and misleading statements regarding the success of the Relyvrio commercial launch. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1)  that the purported "significant demand" for the drug was driven by an initial, temporary surge of patients that had already stabilized, thereby eliminating any realistic prospect for continued growth; (2) within months of Relyvrio's launch, this initial surge had already subsided; (3) accordingly, there was no meaningful growth potential among newly diagnosed ALS patients within ALS treatment centers; (4) there was no viable opportunity for expansion beyond these specialized centers into the broader neurology community; (5) at the same time, Relyvrio was experiencing high, undisclosed discontinuation rates, which materially undermined the drug's commercial viability; and (6) those undisclosed discontinuations had artificially inflated the perceived "runway" for acquiring new net patient starts. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

5.    The truth fully emerged on November 9, 2023 when the Company published a press release announcing the financial results of its third quarter of 2023, announcing generally accepted accounting principles ("GAAP") earnings per share ("EPS") of $0.30, missing consensus estimates by $0.12. On the same day, the Company hosted an earnings call to discuss the third quarter results, where the Individual Defendants confirmed, *inter alia*,  that the results were impacted by an increased rate of patients discontinuing treatment with Relyvrio and a slowdown in the net addition of new patients for Relyvrio.

6.      Also on November 9, 2023, *Investor's Business Daily* published an article discussing the Company's disappointing financial performance (the "*IBD* Article"). The article referenced commentary from an Evercore ISI analyst who questioned Amylyx's claim that the number of new patients initiating treatment with Relyvrio remained "steady," stating that his calculations indicated otherwise. The analyst further noted that Amylyx had restricted analysts' access to Relyvrio prescription data beginning in the summer of 2023. He also criticized the Company's lack of transparency, stating that, given the stock's underperformance throughout 2023, "management could have communicated the discontinuations dynamic much earlier." The analyst added that the stock's negative movement, occurring within a broader downturn in the biotech sector, further eroded investor confidence among shareholders who had continued to hold stock.

7.      On this news, the price of the Company's stock fell $5.74 per share, or approximately 31. 9%, from a closing price of $18.00 per share on November 8, 2023, to close at $12.26 per share on November 9, 2023.

8.      During the Relevant Period and as noted above, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

9.      Additionally in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.      Moreover, five of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***approximately $10.1 million***.

11.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Co-Chief Executive Officers ("CEOs"), its Chief Financial Officer ("CFO"), and its Chief Commercial Officer ("CCO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Cohen's, Klee's, Frates's and Olinger's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §

78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of Amylyx. Plaintiff has continuously owned Amylyx common stock at all relevant times.

### Nominal Defendant Amylyx

19.     Amylyx is a Delaware corporation with its principal executive offices at 43 Thorndike St., Cambridge, Massachusetts 02141. Amylyx's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "AMLX."

### Defendant Cohen

20.     Defendant Cohen co-founded Amylyx in 2013 and has served as the Company's Co-CEO and as a Company director since January 2014. According to the Schedule 14A the Company filed with the SEC on April 24, 2025 (the "2025 Proxy Statement"), for the fiscal year

ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Cohen received $7,418,169 in total compensation from the Company. This included $621,000 in salary, $1,604,000 in stock awards, $4,733,928 in option awards, $447,741 in non-equity incentive plan compensation, and $11,500 in all other compensation.

21.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Cohen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 6, 2023 | 5,968 | $36.43 | $217,438 |
| March 16, 2023 | 100,000 | $32.41 | $3,214,200 |

Thus, in total, before the fraud was exposed, Defendant Cohen sold a total of 105,968 shares of Company common stock on inside information for a total of approximately $3.4 million in proceeds. Defendant Cohen's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.    The 2025 Proxy Statement stated the following about Defendant Cohen:

***Joshua Cohen*** has served as our Co-Chief Executive Officer and a member of our board of directors since January 2014. He co-founded Amylyx in 2013 and continues to serve as its Co-Chief Executive Officer, overseeing its growth from inception through its IPO, FDA and Health Canada approvals, and product launch. Mr. Cohen co-invented the oral combination of sodium phenylbutyrate (PB) and taurursodiol (TURSO, also known as ursodoxicoltaurine), which is being explored for the potential treatment of neurodegenerative diseases. Mr. Cohen holds a B.S. in Biomedical Engineering from Brown University, where he was a National Merit Scholar. While attending Brown, Mr. Cohen founded the Brown Biotechnology Investment Group and published research at the National Institutes of Standards and Technology (NIST) and in the *Journal of Pharmaceutical Sciences*. We believe that Mr. Cohen is qualified to serve on our board of directors because of his experience, qualifications, attributes and skills, including his familiarity with and experience building our company as its Co-Chief Executive Officer and Co-Founder, as well as his knowledge and familiarity with corporate management, clinical trials, neurodegenerative disease research and drug development.

**Defendant Klee**

23.     Defendant Klee co-founded Amylyx in 2013 and has served as the Company's Co-CEO and as a Company director since January 2014. According to the 2025 Proxy Statement, for the 2023 Fiscal Year, Defendant Klee received $7,418,169 in total compensation from the Company. This included $621,000 in salary, $1,604,000 in stock awards, $4,733,928 in option awards, $447,741 in non-equity incentive plan compensation, and $11,500 in all other compensation.

24.     During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Klee made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 6, 2023 | 5,968 | $36.43 | $217,438 |
| March 16, 2023 | 100,000 | $32.16 | $3,215,800 |

Thus, in total, before the fraud was exposed, Defendant Klee sold a total of 105,968 shares of Company common stock on inside information for a total of approximately $3.4 million in proceeds. Defendant Klee's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     The 2025 Proxy Statement stated the following about Defendant Klee:

*Justin Klee* has served as our Co-Chief Executive Officer and a member of our board of directors since January 2014. He co-founded Amylyx in 2013 and continues to serve as its Co-Chief Executive Officer, overseeing its growth from inception through its initial public offering ("IPO"), U.S. Food and Drug Administration ("FDA") and Health Canada approvals, and product launch. Mr. Klee co-invented the oral combination of sodium phenylbutyrate (PB) and taurursodiol (TURSO, also known as ursodoxicoltaurine), which is being explored for the potential treatment of neurodegenerative diseases. Prior to co-founding Amylyx, Mr. Klee conducted research in neurophysiology and Alzheimer's disease

at Harvard Medical School to explore new approaches to treating relentlessly progressive neurodegenerative diseases. Mr. Klee holds a B.S. in Neuroscience from Brown University, where he previously conducted research in neural systems. We believe that Mr. Klee is qualified to serve on our board of directors because of his experience, qualifications, attributes and skills, including his familiarity with and experience building our company as its Co-Chief Executive Officer and Co-Founder, as well as his knowledge and familiarity with corporate management, clinical trials, neurodegenerative disease research and drug development.

**Defendant Frates**

26.    Defendant Frates has served as the Company's CFO since 2021. According to the 2025 Proxy Statement, for the 2023 Fiscal Year, Defendant Frates received $3,510,377 in total compensation from the Company. This included $510,000 in salary, $695,077 in stock awards, $2,052,137 in option awards, $241,663 in non-equity incentive plan compensation, and $11,500 in all other compensation.

27.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Frates made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 6, 2023 | 2,658 | $36.43 | $96,841 |
| March 16, 2023 | 32,500 | $32.16 | $1,045,265 |
| May 16, 2023 | 32,500 | $27.26 | $886,047 |

Thus, in total, before the fraud was exposed, Defendant Frates sold a total of 67,658 shares of Company common stock on inside information for a total of approximately $2.02 million in proceeds. Defendant Frates's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.    The 2025 Proxy Statement stated the following about Defendant Frates:

***James Frates*** has served as our Chief Financial Officer since January 2021. Previously, Mr. Frates served as Chief Financial Officer of Alkermes plc, a

biopharmaceutical company, and its predecessor organization, from July 1998 to January 2021. Mr. Frates has served as a member of the board of directors of Sage Therapeutics, Inc. (Nasdaq: SAGE), a biopharmaceutical company, since June 2014. Mr. Frates has an A.B. in Government from Harvard College and an M.B.A. from the Harvard Graduate School of Business Administration.

**Defendant Olinger**

29.    Defendant Olinger served as the Company's CCO from May 2019 until December 2023. According to the Schedule 14A the Company filed with the SEC on April 24, 2024, 2024 (the "2024 Proxy Statement"), for the 2023 Fiscal Year, Defendant Olinger received $3,447,150 in total compensation from the Company. This included $488,750 in salary, $618,914 in stock awards, $1,736,927 in option awards, $225,216 in non-equity incentive plan compensation, and $378,063 in all other compensation.

30.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Olinger made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 6, 2023 | 2,403 | $36.43 | $87,550 |

Thus, in total, before the fraud was exposed, Defendant Olinger sold a total of 2,403 shares of Company stock on inside information for a total of approximately $87,550 in proceeds. Defendant Olinger's insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

31.    The Schedule 14A the Company filed with the SEC on April 27, 2023 (the "2023 Proxy Statement") stated the following about Defendant Olinger:

*Margaret Olinger* has served as our Chief Commercial Officer since May 2019. Previously, Ms. Olinger served in various leadership and commercial positions for more than a decade at Alexion Pharmaceuticals, a biopharmaceutical company. Ms.

Olinger has a B.S. in Business Administration from Albertus Magnus College and an M.B.A. from New Haven University.

**Defendant Firestone**

32.     Defendant Firestone has served as a Company director since March 2023. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

33.     The 2025 Proxy Statement stated the following about Defendant Firestone:

***Karen Firestone*** has served as a member of our board of directors since March 2023. Ms. Firestone is Co-founder and Chair Emerita of Aureus Asset Management, an investment firm that manages over $6 billion of assets for families, individuals, and non-profit entities, which role she has held since 2005. Previously, she spent 22 years at Fidelity Investments, most recently as a diversified fund manager of Destiny 1 Fund, the Large Cap Fund, Advisor Large Cap Fund and managing numerous sector funds, including Biotechnology, Health Care, and Media. Ms. Firestone serves as a Trustee Emerita at the Beth Israel Deaconess Medical Center. She is a member of the Boston Athletic Association. Ms. Firestone received a Bachelor of Arts degree in economics, magna cum laude, from Harvard College and an MBA from Harvard Business School. We believe Ms. Firestone is qualified to serve on our board of directors because of her experience, qualifications, attributes and skills.

**Defendant Milne**

34.     Defendant Milne has served as a Company director since 2015 and as Chaiman of the Board since 2021. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee, the Compensation Committee, and the Science and Technology Committee.

35.     During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Olinger made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 16, 2023 | 35,000 | $32.15 | $1,125,320 |

Defendant Milne's insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

36.    The 2025 Proxy Statement stated the following about Defendant Milne:

***George Mclean Milne Jr., Ph.D.*** has served on our board of directors since 2015 and as chair of our board since December 2021. Dr. Milne has over 30 years of experience in pharmaceutical research and product development, including over 20 years of experience as a board member and lead director of multiple biopharmaceutical companies. He retired from Pfizer in 2002 where he served as Executive Vice President of Global Research and Development and President, Worldwide Strategic and Operations Management. He joined Pfizer in 1970 and held a variety of positions conducting both chemistry and pharmacology research. Dr. Milne became director of the department of immunology and infectious diseases at Pfizer in 1981, was its executive director from 1984 to 1985, and was Vice President of research and development from 1985 to 1988. He was appointed Senior Vice President in 1988. In 1993, he was appointed President of Pfizer Central Research and a Senior Vice President of Pfizer with global responsibility for human and veterinary medicine research and development. Dr. Milne has served on the board of directors of Gaylord Specialty Healthcare since 2016, New York Botanical Garden since 1998, and Sea Research Foundation since 1995. Dr. Milne has also previously served on multiple corporate boards of directors, including Aurinia Pharmaceuticals Inc. (NASDAQ: AUPH), a biotechnology company from 2017 until 2023, Charles River Laboratories International, Inc. (NYSE: CRL), a laboratory services company from 2002 until 2022, BioStorage Technologies, Inc. from 2006 until 2016, MedImmune, Inc., a biotechnology company, and Mettler-Toledo, Inc., an instrument manufacturing company, among others. Dr. Milne has a B.S. in Chemistry from Yale University and a Ph.D. in Organic Chemistry from the Massachusetts Institute of Technology. We believe that Dr. Milne is qualified to serve on our board of directors because of his experience, qualifications, attributes and skills.

**Defendant Fonteyne**

37.    Defendant Fonteyne has served as a Company director since March 2021. He also serves as Chair of the Compensation Committee and as a member of the Science and Technology Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Fonteyne:

*Paul Fonteyne* has served as a member of our board of directors since March 2021. Mr. Fonteyne is the retired chair and Chief Executive Officer of Boehringer-Ingelheim, USA ("BI"), a subsidiary of Boehringer Ingelheim International GmbH ("Boehringer"), a global pharmaceutical company. He was with BI or BI subsidiaries from 2003 to December 2018 and made substantial contributions to BI. Prior to 2003, Mr. Fonteyne served in leadership positions at Merck and Co. Inc. as well as Abbott Laboratories. He has served on the boards of directors of Apnimed Pharmaceuticals, a clinical-stage pharmaceutical company, since October 2023, Apellis Pharmaceuticals, a biotechnology company, since April 2020, Corium, LLC, a private commercial-stage biopharmaceutical company, since August 2024, DalCor, Inc., a pharmaceutical company, since 2019, and Ypsomed AG, a biotechnology company, since 2018. Mr. Fonteyne also served as a member of the board of directors of Gelesis Holdings, Inc., a biotechnology company, from April 2018 until its voluntary petition for liquidation in 2023; Covetrus Inc., an animal health company, from May 2021 until its merger with Corgi Bidco, Inc. in October 2022, ResTORbio Inc., a biotechnology company, from December 2017 until its reverse merger with Adicet Bio, Inc. in September 2020, as well as member of the board of directors of AMAG Pharmaceuticals, Inc. from November 2019 until its sale to Covis Group S.à.r.l. in November 2020. Mr. Fonteyne has also served on the board of the Pharmaceutical Research and Manufacturers of America, chaired the National Pharmaceutical Council and is actively participating as a founder in biopharma spinouts from Yale University in the fields of Alzheimer's disease and Alzheimer and fibrotic diseases. Mr. Fonteyne received his M.B.A. from Carnegie-Mellon University and his M.S. in Chemical Engineering from the Polytechnic School at the University of Brussels. We believe Mr. Fonteyne is qualified to serve on our board of directors because of his experience, qualifications, attributes and skills, including his past experience in the life sciences industry.

## Defendant Quimi

39.    Defendant Quimi has served as a Company director since June 2021. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Quimi:

*Daphne Quimi* has served as a member of our board of directors since June 2021. Ms. Quimi has more than 25 years of executive experience in the pharmaceutical and biotechnology industries with expertise in global finance operations, company building, and rare disease drug commercialization. Ms. Quimi served as chief financial officer of Amicus Therapeutics, Inc. ("Amicus"), a biotechnology company from January 2019 until August 2023 and as the advisor to the chief financial officer of Amicus until March 2024 after holding various roles at Amicus since 2007. Ms. Quimi also serves on the board of directors at Century Therapeutics, Inc. (Nasdaq: IPSC) since October 2022 and Chiesi Farmaceutici S.p.A. since January 2025. Prior to that, Ms. Quimi served as Director of

Consolidations and External Reporting at Bristol-Myers Squibb Company, a global biopharmaceutical company, from 2005 to 2007. Ms. Quimi received a B.S. in Accountancy from Monmouth University and an M.B.A. from the Stern School of Business of New York University. We believe Ms. Quimi is qualified to serve on our board of directors due to her financial expertise and industry experience.

**Relevant Non-Parties**

41.     The Securities Class Action captioned *Shih v. Amylyx Pharmaceuticals, Inc., et al.*, Case No. 1:24-cv-12068-NMG, in the United States District Court for the Southern District of New York, incorporates statements from former employees of Amylyx who offered their experiences. The following are the former employees whose statements are referenced throughout this complaint before this Court.

*FE1*

42.     FE1, a former sales representative at Amylyx, was responsible for managing all major accounts in New York City, one of the top three geographic regions in the country for Relyvrio distribution and promotion. FE1 joined Amylyx in November 2022 and left in May 2024, bringing with them decades of prior experience in pharmaceutical sales.[1]

*FE2*

43.     FE2 served as a Regional Business Director at Amylyx from September 2021 to December 2023, overseeing sales operations for the West Coast. Only five individuals held this title nationally, each responsible for a major portion of the U.S. market. FE2's territory included every Pacific-bordering state—California, Oregon, Washington, Alaska, Hawaii, Nevada, Utah, Montana, Wyoming, and Idaho, collectively representing approximately 25% of Relyvrio's total sales. FE2 directly supervised eight sales representatives.

*FE3*

---

[1] Former Amylyx employees are herein referred to as "FE#" and are all referenced using gender-neutral pronouns to maintain their confidentiality.

44.     FE3 served as a sales training coordinator at Amylyx from January 2022 to June 3, 2024. In this role, FE3 was responsible for developing and delivering training programs for the commercial team, including onboarding and continuous education related to Relyvrio. While FE3 did not have direct access to sales or discontinuation data, they worked closely with Head of Sales Tim Lee ("Lee") and observed the inconsistent messaging from the Company's leadership.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45.     By reason of their positions as officers and/or directors of Amylyx and because of their ability to control the business and corporate affairs of Amylyx, the Individual Defendants owed Amylyx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amylyx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amylyx and its shareholders so as to benefit all shareholders equally.

46.     Each director and officer of the Company owes to Amylyx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amylyx, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of Amylyx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Amylyx, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Amylyx's Board at all relevant times.

50.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

51.     To discharge their duties, the officers and directors of Amylyx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Amylyx were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Amylyx's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Amylyx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Amylyx and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Amylyx's operations would comply with all applicable laws and Amylyx's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

17

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.      Each of the Individual Defendants further owed to Amylyx and the shareholders the duty of loyalty requiring that each favor Amylyx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Amylyx and were at all times acting within the course and scope of such agency.

54.      Because of their advisory, executive, managerial, and directorial positions with Amylyx, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Amylyx.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Amylyx was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

59.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amylyx and was at all times acting within the course and scope of such agency.

## AMYLYX'S CODE OF CONDUCT

61.     The Company's Code of Conduct represents that it was adopted to "aid the Company's directors, officers, employees and certain designated agents in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties." The Code of Conduct also states that the Company's Board of Directors "or a committee of the Board is responsible for administering the Code."

62.     In a section titled "Compliance with Laws, Rules, and Regulations; Whistleblower Protection," the Code of Conduct states the following, in relevant part:

> The Company requires that all employees, officers, directors and designated agents comply with all laws, rules, policies and regulations applicable to the Company wherever it does business. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules, policies and regulations and to ask for advice when you are uncertain about them.

> If you become aware of the violation of any law, rule, policy, or regulation by the Company, whether by its officers, employees, directors, or any third-party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the Compliance Officer. While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority as outlined in the next paragraph.

63.     In a section titled "Insider Trading," the Code of Conduct states:

> Employees, officers, directors and designated agents who have material non-public information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To help ensure that you do not engage in prohibited insider trading and avoid even the appearance of an improper transaction, the Company has adopted an Insider Trading Policy, which is distributed to employees and is also available from the Compliance Officer. If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the Compliance Officer before making any such purchase or sale.

64.    In a section titled "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

> The Company recognizes and respects the right of its directors, officers, employees and designated agents to engage in outside activities that they may deem proper and desirable, provided that these activities do not impair, interfere, or appear to interfere with the performance of their duties to the Company or their ability to act in the Company's best interests. In most, if not all, cases this will mean that our directors, officers, employees and designated agents must avoid situations that present a potential or actual conflict between their personal interests and the Company's interests.

65.    In a section titled "Protection and Proper Use of Corporate Assets," the Code of

Conduct states the following:

> Employees, officers, directors and designated agents should seek to protect the Company's assets. Theft, carelessness and waste have a direct impact on the Company's financial performance. Employees, officers and directors must use the Company's assets and services solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else.

66.    In a section titled "Accuracy of Records," the Code of Conduct states:

> Employees, officers, directors and designated agents must honestly and accurately report all business transactions and abide by the Company's internal accounting controls. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

67.    In a section titled "Quality of Public Disclosures," the Code of Conduct states that

"It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure

in reports and documents filed with, or submitted to, the Securities and Exchange Commission and

in other public communications."

68.    In a section titled "Monitoring Compliance and Disciplinary Action," the Code of

Conduct states the following:

> The Company's management, under the supervision of its Board or a committee of
> the Board or, in the case of accounting, internal accounting controls, auditing or
> securities law matters, the Audit Committee, shall take reasonable steps to (i)
> monitor compliance with the Code, and (ii) when appropriate, impose and enforce
> appropriate disciplinary measures for violations of the Code.
>
> Disciplinary measures for violations of the Code will be determined in the
> Company's sole discretion and may include, but are not limited to, counseling, oral
> or written reprimands, warnings, probation or suspension with or without pay,
> demotions, reductions in salary, termination of employment or service, and
> restitution.
>
> The Company's management shall periodically report to the Board or a committee
> of the Board on these compliance efforts including, without limitation, alleged
> violations of the Code and the actions taken with respect to violations.

69.    In a section titled "Waivers and Amendments," the Code of Conduct states the

following, in relevant part:

> No waiver of any provisions of the Code for the benefit of a director or an executive
> officer (which includes, without limitation, the Company's principal executive,
> financial and accounting officers) shall be effective unless (i) approved by the
> Board or, if permitted, the Audit Committee, and (ii) if required, the waiver is
> promptly disclosed to the Company's securityholders in accordance with applicable
> U.S. securities laws and the rules and regulations of the exchange or system on
> which the Company's shares are traded or quoted, as the case may be.

70.    In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of

corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law.

## AMYLYX'S AUDIT COMMITTEE CHARTER

71.    The Company's Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Amylyx Pharmaceuticals, Inc. (the "Company") are to (A) assist the Board of Directors (the "Board") in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"), and (4) the performance of the Company's internal audit function; and (B) prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

72.    Under the heading "Responsibilities and Authorities," in a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states the following, in relevant part:

> 1. The Audit Committee shall review the overall audit plan (both internal and external) with the Independent Auditors and the members of management responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to collectively as the "Senior Accounting Executive").

> \* \* \*

> 3. The Audit Committee must review:

>> (i)    any analyses prepared by management, the internal auditors, if any, and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

(ii)  major issues as to the adequacy of the Company's internal controls and any special audit steps taken in light of material control deficiencies;

(iii)  major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv)  the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements.

\* \* \*

9.  If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer(s) and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

10.  Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the Independent Auditors of the matters required to be discussed by AS 1301, and (3) with the Independent Auditors concerning the Independent Auditors' independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

73.  Under the same heading, in a subsection titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter states the following:

1. The Audit Committee shall discuss with management and the Independent Auditors, before the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to PCAOB AS 4105, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

74.    Under the same heading, in a subsection titled "Earnings Press Releases," the Audit Committee Charter states the following:

1. The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

75.    Under the same heading, in a subsection titled "Risk Assessment and Management," the Audit Committee Charter states the following:

1. The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

2. In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures, including but not limited to financial statement and disclosure risks; legal and regulatory compliance risks; tax risks; finance, liquidity and capital structure risks; code of conduct and ethics risks; cultural issues and risks; and cybersecurity, data privacy and other IT-related risks.

76.    Under a section titled "Regular Reports to the Board," the Audit Committee Charter states the following:

1. The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Independent Auditors, the performance of the internal audit function and any other matters that it deems appropriate or is requested to review for the benefit of the Board.

77.    The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.    Amylyx is a Delaware-incorporated commercial-stage biotechnology company specializing in the research and development for treatments for ALS, or Lou Gehrig's disease, as well as other neurodegenerative diseases. Among the Company's product portfolio is Relyvrio (generally AMX0035), which is a dual UPR-Bax apoptosis inhibitor made up of sodium phenylbutyrate and taurursodiol, used for treating ALS in adults in the United States.

79.    Relyvrio is the Company's only approved drug available in the United States, making it the essential product of the Company's commercial pipeline. As such, the success of Relyvrio could be used to expand the Company's research for other treatments to neurological diseases, making the drug's launch vital to the Company's overall success.

80.     Normally, before a drug can obtain FDA approval, it must generally progress through three progressively rigorous phases of clinical trials. Phase I trials involve a small group of volunteers or patients and are designed to evaluate the drug's initial safety and tolerability. Phase II trials are conducted in a limited patient population suffering from the targeted condition, with the objective of determining optimal dosing, further assessing safety, and providing preliminary evidence of efficacy. Phase III trials are large-scale, multicenter, and well-controlled studies involving patients with the specific disease, aimed at generating statistically robust data to confirm the drug's safety and efficacy. Upon successful completion of these phases, a company typically submits a "new drug application" to the FDA for commercial review and potential approval.

81.     Due to the urgent unmet need in the market, the demand from patients due to the nature of the disease, and pressure from advocacy groups and Congress, the FDA granted early commercial approval, despite Relyvrio still being in Phase III clinical trials. The ongoing Phase III trial (the "Phoenix Study") was a 48-week, randomized, placebo-controlled global trial designed to further evaluate Relyvrio's safety and efficacy in treating ALS. The primary efficacy endpoint measured changes from baseline in the ALS Functional Rating Scale-Revised (ALSFRS-R), which scores 12 key physical functions impacted by ALS, from 4 (normal) to 0 (no function), with a total possible score ranging from 0 to 48. Secondary endpoints included patient-reported quality of life, overall survival, and respiratory function.

82.     In September 2022, the FDA approved Relyvrio for treatment of adults with ALS in the United States. In light of the early FDA approval and the need to evaluate Relyvrio's long-term efficacy, Amylyx executives stated prior to the drug's September 2022 approval that they

would withdraw it from the market if the Phase III Phoenix Study trial failed to yield positive results.

83.    Amylyx commercially launched Relyvrio in the U.S. on October 24, 2022. From the outset, the Individual Defendants promoted the strength of the launch and the potential for continued growth in new patient subscriptions. These assurances occurred throughout the Relevant Period despite concerning trends in declining new subscribers and patient discontinuations tempering that growth.

**Former Employees Reveal the Issues the Company Was Facing Regarding Lack of New Subscribers and Patient Discontinuations**

84.    Behind the scenes, however, former employees ("FEs"), interviewed in the Securities Class Action, recount a markedly different narrative, one in which the Defendants allegedly conspired to conceal the sharp decline in new patient enrollments and the high rate of early treatment discontinuations from the market.

85.    According to these FEs, there is "absolutely" no doubt that the Defendants misrepresented Relyvrio's commercial trajectory, particularly with respect to the drug's prescription rate. They assert that the rate of new patient initiations was clearly declining and that discontinuation rates were significantly higher than publicly disclosed, leading to a material overstatement of Relyvrio's success and market potential. Specifically, and as detailed further below, the Defendants: (1) deliberately withheld key data from the market concerning these critical metrics; (2) were fully aware that new patient starts were falling rapidly post-launch, driven initially by a limited surge of early demand that they knew was neither sustainable nor reflective of long-term growth potential; and (3) failed to disclose that many patients were discontinuing treatment within just weeks, further inflating the perceived opportunity for Relyvrio to reach untapped patient populations.

***The Relyvrio Launch was Structured to Intentionally Hide Data of New
Prescriber Rates and Discontinuations from the Market***

86.     Both FE1 and FE2 described how, during the commercial launch of Relyvrio, the

Individual Defendants caused the Company to intentionally obscure data regarding prescription

volumes and patient discontinuation rates not only from the market, but also from its own internal

teams.

87.     FE2 explained that, early in the launch, Amylyx implemented a "limited

distribution model," in which Relyvrio was dispensed exclusively through a small number of

specialty pharmacies, and both healthcare providers and patients were required to use Amylyx's

in-house patient services. While this approach was not inherently problematic, FE2 emphasized

that management had consistently communicated internally that the purpose of this model was to

allow the Company to retain full control over key data. According to FE2, the distribution strategy

was designed to "control[] costs, data, and everything else," and internally, it was used "to try to

hide the data as much as they could."

88.     As a sales representative, FE1 confirmed a clear lack of transparency within

Amylyx regarding both subscriber numbers and patient discontinuation rates. Although initially

enthusiastic about joining the Company for the opportunity to help ALS patients, FE1 quickly

became concerned, noting there were a lot of things "I have seen with [Amylyx] that I have never

seen with any other companies" in over 20 years of pharmaceutical sales experience.

89.     Shortly after starting, FE1 began to "question everything" due to practices that

appeared inconsistent with industry standards. For example, FE1 noted that sales representatives

were only given access to sales numbers for their individual territories, which was an unusual

practice. At other pharmaceutical companies that FE1 worked for, they "always had transparency

as far as numbers, where you ranked compared to other people in the country, discontinuation

rates, everything." However, FE1 stated "we had nothing [at Amalyx]; not even my manager had exposure to what was happening with the rest of the country," as internal data was "not shared."

90.     Similarly, during FE2's tenure as regional director, Amylyx did not provide access to data from other regions of the country. According to FE2, the explanation provided by management was that they "don't want it to be easily added up so that somebody outside could find out what's going on." This was a justification FE2 characterized as "bulls**t." As a result, FE2 received performance data only for their own region and was denied visibility into the remaining four U.S. regions.

91.     FE2 expressed disbelief at how Amylyx "got away with hiding data from analysts in the summer of 2023," during the commercial rollout of Relyvrio. FE2 believed this information was intentionally withheld from internal teams to prevent it from reaching the analyst community or leaking to the broader market. Additionally, Amylyx ceased reporting new patient subscriber data to third-party market research firms IQVIA and Symphony in the summer of 2023.

***Demand and New Patient Subscriber Rates Plateau After the Initial Influx***

92.     According to FE1, early demand lasted only for the "first three or four months" following Relyvrio's commercial launch, around February 2023. After that period, FE1 observed, there was "no chance for growth."

93.     FE1 explained that the initial wave of prescriptions was driven by the urgent needs of ALS patients and the absence of effective treatment alternatives. At launch, there was significant anticipation around Relyvrio, with many patients eager to begin therapy immediately. FE1 noted that ALS is a terminal disease, and patients were "going to die in five years." Given the life-threatening nature of the condition, FE1 explained, if someone you know has ALS, and there's even a possibility of a new medication, "everyone wanted to go on it."

94.     As a result, the initial bolus of patients was "overwhelming even for the company to triage all these prescriptions." Once the prescriptions stabilized after the initial surge, FE1 noted that there was "no growth" and was generally "flat throughout the country."

95.     Even within the already limited pool of potential new patients, not all newly diagnosed individuals were willing to begin treatment. As FE1 explained, "not every single newly diagnosed patient wanted to get on any treatment," noting that Relyvrio is "not a cure," and many patients were reluctant to endure potential side effects without a guaranteed benefit. One of FE1's primary prescribing physicians at a major ALS center estimated that approximately 40% of their patients chose not to take Relyvrio. FE1 repeatedly conveyed to their manager, Beth Kinsella, Regional Business Director of the Northeast, that "this product has no potential to grow. It's not an antibiotic."

96.     FE1's sales data clearly reflected the steep decline in new patient starts. Despite covering one of the largest and most densely populated territories in the country, FE1 averaged only about 10 new patients per month. At FE1's largest account, Columbia University, 246 prescriptions accounted for roughly 66% of total sales. However, the data also showed a consistent decline: in the fourth quarter of 2022, FE1 recorded 122 prescriptions; in the first quarter of 2023, that number dropped to 44; the second quarter 2023 fell further to 27; the third quarter 2023 showed a slight increase to 33; and the fourth quarter 2023 declined again to 21 prescriptions.

97.     Despite claims that, while the initial surge in Relyvrio prescriptions came from ALS centers, future growth would come from targeting patients treated by general neurologists, FE1 strongly disputed this, calling it "baloney," and explained that general neurologists typically do not manage ALS patients beyond diagnosis due to the disease's complexity. Instead, patients are referred to ALS specialty centers for comprehensive care.

98.     FE1, who attended every investor call, was "in awe" of management's assertions. FE1 concluded that management's statements were misleading and intended to obscure the drug's limited growth potential. FE1's own sales data supported this: throughout the entire launch period, only two general neurologists in FE1's territory prescribed Relyvrio, confirming that the commercial opportunity outside ALS centers was significantly overstated.

99.     The Company's sales team were also given "ridiculous" internal quotas according to FE2, due to the initial bolus and inability for meaningful growth. FE2 confirmed that Amylyx's sales quotas were "impossible," citing conversations with representatives from competitor Mitsubishi Tanabe Pharma America, who reported significantly lower targets and were told they were "blowing it out of the water."

100.    According to FE2, Amylyx management was "overpromising and underdelivering," attempting to push representatives to hit inflated numbers aligned with projections made to Wall Street. FE2 described a pressure-driven culture led "by fear," where no one met targets which is a rarity in the industry, especially during a product launch. Senior leadership was disorganized, frequently argumentative, and dismissive of feedback, offering little guidance and responding to questions or suggestions with frustration. All in all, FE2 stated that the Company "took advantage of these desperate people and then the sh**show just continued." As every quarter passed, the sales team was unable to meet their goals, and senior leadership continued to inflate the goal.

101.    According to FE2, while the Individual Defendants publicly projected strong sales performance, the internal reality was very different. "That wasn't true," FE2 stated, "[o]ur boss was basically pitting us against each other," and that "we need to do better and were underperforming," despite management telling Wall Street that sales goals were being exceeded.

102.    This disconnect was echoed by FE3, who revealed that senior executives internally downplayed performance concerns, while externally promoting optimistic narratives, particularly after the initial surge in demand had subsided.

103.    FE3 recalled that by mid-2023, internal messaging at Amylyx had become increasingly inconsistent. As a member of the commercial team working closely with Lee, FE3 noted that Lee frequently pushed the training department to help "fill gaps" by enhancing field team performance through continuous learning and development, and these efforts clearly aimed at boosting lagging sales figures. FE3 understood from Lee, and indirectly from Defendant Olinger, that the sales team needed to improve results.

104.    At the same time, however, Amylyx's Defendants Cohen and Klee were publicly projecting a highly optimistic outlook. FE3 stated that the team would hear that everything was going great, with "rainbows and butterflies" energy. After one regional meeting during that period, leadership spoke enthusiastically about the company's performance, but coworkers were privately expressing concern, asking whether they should be worried, as "rumblings" of internal anxiety began to spread.

105.    Shortly after that regional meeting, FE3 raised concerns during a private discussion with FE3's supervisor, Laura Jamieson—the Global Head of Training and Development—and Lee. FE3 recalled asking, "I know [Defendant Olinger] is saying this, but the CEOs are saying that. What is really going on?" According to FE3, Lee responded vaguely, acknowledging that issues like high discontinuation rates needed to be addressed but suggesting that the CEOs were focused on other priorities. "He beat around the bush," FE3 said, "and it was confusing."

**The Individual Defendants Resort to Futile Attempts to Boost Patient Subscriptions After the Initial Influx**

106.    The initial influx of patients ended around February 2023, and the FEs recall how the Individual Defendants shifted gears to desperately increase patient subscriptions at any cost.

107.    First, FE2 recalls that the Company resorted to a "quid pro quo" scheme in order to boost growth. After the initial surge in demand subsided, FE2 described how sales teams were assigned quotas that "were ridiculous" and unattainable. With FE2's manager under pressure for missed targets, he began urging Dave MacLeod—Head of Global Patient Services and Commercial Distribution—and Keith White—Head of Market Access—to open up the limited distribution model. The goal was to allow more institutions to dispense Relyvrio, thereby expanding access and driving revenue.

108.    FE2 detailed a problematic arrangement in which medical institutions ordinarily focused solely on patient care were allowed to act as distributors. This enabled them to collect fees typically reserved for wholesalers and pharmacies. While this structure avoided direct payments for prescriptions, it nonetheless created financial incentives tied to prescribing volume.

109.    FE2 reported raising concerns to Keith White after being instructed by a supervisor to identify the top ten accounts that might increase business if allowed to distribute Relyvrio; an arrangement FE2 recognized as a clear quid pro quo. According to FE2, leadership was explicitly asking whether accounts would generate more prescriptions in exchange for being granted distribution rights. "I said to Keith," FE2 recalled, "this is how it sounds: you guys are trying to get business by opening up the distribution model and specifically asking people, will you give us more business if we let you distribute the drug? Will your doctors write more?" White dismissed the concern, claiming FE2 had simply "misunderstood."

110.    However, FE2 was confident there was no misunderstanding. Leadership had circulated a spreadsheet detailing the plan, reinforcing that this was an intentional strategy. When

FE2 attempted to escalate the issue to Head of Compliance and attorney, Sue Dyer, and included the spreadsheet, FE2 later discovered that related emails had been deleted. "I know those emails existed," FE2 said. "I will bet my life on it." FE2 also described a broader culture of retaliation and suppression at Amylyx: employees who spoke up were either fired or ignored. Human Resources and Compliance, including Sue Dyer, were routinely aware of complaints but allegedly looked the other way.

111.    Following the initial surge in demand, FE2 confirmed that when the Individual Defnendants struggled to bring in new patients and meet revenue targets, they shifted blame rather than acknowledging deeper issues. According to FE2, Tim Lee—Director of Sales—frequently clashed with Defendant Frates. After the new patient influx subsided, Defendant Frates issued aggressive forecasts, which Lee considered unrealistic. Frates's response, according to FE2, was: "do whatever you've got to do" to hit the numbers. In turn, Lee allegedly encouraged unethical tactics, including paying doctors or offering speaker fees to drive prescriptions. "That's the bulls*** of my industry," FE2 remarked.

112.    FE2 also described dysfunction at the senior commercial level, noting that Defendant Olinger's five direct reports were frequently at odds. According to FE2, they constantly argued and blamed one another, "all saying it was someone else's fault; nobody was working together." As sales targets continued to be missed from quarter to quarter, leadership routinely scapegoated others to deflect from their own role in the declining performance and suppressed data.

**Relyvrio Experienced Increasing Discontinuation Rates Early into Treatment**

113.    In November 2023 the Individual Defendants acknowledged patients were discontinuing the drug "after six months" of treatment.

114.    However, two former employees contradict this timeline. FE1 stated that patients were often stopping treatment within the first month or two, which was well before the six-month mark claimed by the Individual Defendants. FE2 confirmed this, asserting that senior leadership was "absolutely" overstating Relyvrio's commercial viability, despite being aware of early drop-offs.

115.    While the Individual Defendants consistently promoted the potential for increasing patient subscriptions, their failure to disclose high discontinuation rates painted a misleading picture of Relyvrio's growth trajectory. By reporting only "net adds" without accounting for how many patients were stopping treatment, they obscured the actual subscription base and the realistic limits of future growth.

116.    According to FE2, Defendants Klee and Cohen repeatedly claimed that 30,000 ALS patients in the U.S. were potential candidates for Relyvrio, suggesting significant growth potential from the 1,000 to 3,800 reported users. However, at the peak of the initial launch, FE2 noted that "we already had 9,000 patients on the drug" and "we already had a third of the business." Despite this, senior leadership insisted the team was underperforming. FE2 concluded that excluding discontinuation data from internal and external reporting made both current subscription figures and future projections highly inaccurate.

### False and Misleading Statements

***November 10, 2022 Press Release and Earnings Call***

117.    On November 10, 2022, during after-market hours, the Company issued a press release announcing its financial results for the third quarter of 2022 (the "3Q22 Press Release"). In the 3Q22 Press Release, Defendants Cohen and Klee stated, in relevant part:

> We are thrilled that RELYVRIO . . . [is] now available to people living with ALS in the U.S. . . . and ***we are encouraged by . . . the rate of new prescriptions for this important new therapeutic option***. We continue to work expeditiously during the

early stages of our commercial launch to ensure every eligible person living with ALS will gain access as quickly and efficiently as possible.[2]

118.    That same day, the Company held an earnings call with analysts and investors to discuss the third quarter 2022 results (the "3Q22 Earnings Call"). During the 3Q22 Earnings Call, Defendant Klee stated, "Given we are only a few weeks into the launch in the U.S., it is too early to discuss specific expectations. ***But we are encouraged by the initial engagement with both physicians and with people living with ALS.***"

119.    During Defendant Cohen's prepared remarks on the 3Q22 Earnings Call, he mirrored Defendant Klee's sentiment, stating that "[w]e are excited about the strong initial interest that we are seeing only a couple of weeks into launch" of Relyvrio.

120.    Similarly, during the scripted portion of the 3Q22 Earnings Call, Defendant Olinger remarked, in relevant part:

> In the days and weeks following the FDA's approval of RELYVRIO on September 29, ***we immediately started receiving enrollments and prescriptions through the Amylyx Care Team***, and have heard very positive feedback from physicians in the ALS community about the level of support we are providing. Importantly, on October 24, the first shipment of RELYVRIO from one of our specialty pharmacies was sent to a person living with ALS earlier than we had originally anticipated.
>
> ***In regard to interest in RELYVRIO, we are seeing a solid initial bolus***, including an encouraging number of products enrollment forms and prescriptions coming into the Amylyx Care Team. This initial excitement has also been widespread across the country, and not limited to one geography or group of physicians. The field teams have engaged with clinicians throughout the country, and the feedback from those serving the community has been positive.

121.    During the question-and-answer segment of the 3Q22 Earnings Call, an analyst asked a question regarding "how long [the Individual Defendants] expect patients to stay on drugs in [the Company's] model," to which Defendant Cohen responded:

---

[2] All emphasis has been added unless otherwise noted herein.

*[W]hen it relates to time on therapy, we haven't given specific guidance as to time on therapy for our product. But I can say we've done some research on past products . . . where we see in the ballpark of a year – on average or median.* That being said, one of our hopes with having a really robust education and patient support function is that *we'll be able to educate about the benefits of staying on therapy as well*.

### February 14, 2023 Form 8-K

122.    On February 14, 2023, the Company filed a Form 8-K with the SEC (the "February 2023 8-K"). The February 2023 8-K stated, in relevant part, that "[t]he Company *has observed higher demand for RELYVRIO in the U.S. than initially anticipated pre-launch and, as a result, expects to meaningfully exceed fourth quarter and full-year 2022 Wall Street research analyst consensus estimates for revenue.*"

### March 13, 2023 Press Release and Earnings Call

123.    On March 13, 2023, the Company issued a press release announcing its fourth quarter and full year financial results (the "4Q/FY22 Press Release") for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"). In the 4Q/FY22 Press Release, Defendants Cohen and Klee stated, in relevant part:

> 2022 was an exceptionally exciting year for Amylyx, culminating with the approval of RELYVRIO in the U.S. . . . . *Our commercial launch is off to a strong start, and we are encouraged by the engagement we have seen from physicians*, people living with ALS, and payors . . . . [W]e remain focused on our efforts to engage stakeholders throughout the ALS community as we work to drive the broadest coverage possible for this important new therapeutic option.

124.    On the same day, Amylyx held an earnings call with analysts and investors to discuss the financial results from the fourth quarter and full year of the 2022 Fiscal Year the "4Q/FY22 Earnings Call"). During Defendant Klee's scripted portion of the 4Q/FY22 Earnings Call, he stated that "[s]ince the approval, *we have seen strong interest in RELYVRIO and we are encouraged by the early success of our commercial launch*."

125.    Similarly, during Defendant Frates's prepared remarks on the 4Q/FY22 Earnings Call, he stated:

> *We're pleased to share that at this point in our launch we're meaningfully ahead of our expectations and encouraged by the interest and demand we've seen from the ALS community*. [Defendant Olinger] will share some of the important early metrics that we're tracking, which should help you model our near-term opportunity and the total addressable market for the longer term, but first I'll summarize Q4.
>
> Net product revenues were $21.9 million for the quarter and $22.2 million for the year with the vast majority of that revenue from the [U.S.] As you'll hear from Margaret in a few minutes, *we're seeing robust demand from the ALS community*. Gross-to-net adjustments were approximately 18% in the quarter and in-line with our expectations. We expect gross-to-net to remain in the 15% to 20% range for the year starting at the higher end of that range in Q1 due to the annual reset of co-pays and deductibles in Medicare Part D reenrollment as of January 1st.

126.    As for Defendant Olinger's prepared remarks on the 4Q/FY22 Earnings Call, she described the surge in patient subscriptions as a great opportunity for growth:

> [W]e are seeing our efforts *yield strong results and have observed rapid uptakes* on the FDA's approval on September 29. There were just over 1300 people living with ALS on RELYVRIO in the [U.S.] at the end of 2022, *and uptake has continued since then*.
>
> *We remain optimistic about our ability to continue growing from here as we believe people with ALS and their clinicians are eager to learn about and try new treatment options. By the end of this quarter we believe we are on our pace to roughly double the amount of people on RELYVRIO on a net basis.*
>
> *On the clinician side, we are encouraged by the prescriptions coming from the top ALS doctors and key ALS centers, but there is still significant opportunity for growth*….
>
> Another notable part of our launch is the interest that we are seeing across the spectrum of people living with ALS when we look at the times of initial diagnosis. We are encouraged that regardless of the time since diagnosis, people with ALS are interested in and gaining access to this important new treatment. In other words, we *are seeing people on RELYVRIO who have been newly diagnosed as well as others who have been diagnosed for more than three years*.
>
> As we look throughout the rest of the year, our team remains vigilant in our efforts to educate ALS centers *and look forward to educating the general neurologist.*

*We believe we have a large untapped opportunity for additional growth as we conduct ongoing research outreach. We remain committed to driving access with and support to every eligible person living with ALS who can benefit from treatment.*

127.    During the question-and-answer segment of the 4Q/FY22 Earnings Call, an analyst asked "whether the patient numbers at the end of December . . . was approaching 1500 to 2000." Defendant Frates responded, in relevant part:

*[W]e're seeing the demand increase, right?* And again, [Defendant Olinger] mentioned there were 1300 patients on drug at the end of 12/31 and at the end of Q4, and we're looking at roughly doubling that as we get to the end of March, so 2,600 patients plus or minus.

\* \* \*

And I think I guess I would just say, *we're off to a really good launch*. I think we're probably going to be able to more than double our revenues in Q1. I'd say we'd be closer to tripling our revenues than we are to doubling our revenues, but wouldn't want to give more guidance than that.

128.    Another analyst asked a question about "the centers that are responsible for the book of scripts . . . to get a sense as to the inquiries or the queue of patients across the broader ALS population" and "to get a sense of the breadth of awareness on whatever metric you guys can provide." Defendant Olinger responded, in relevant part:

[T]here's about 2700 physicians that prescribe for ALS, which is our broad target audience. During the first quarter, we are heavily focused on the top ALS centers and the top 500 prescribers of which 55% of them have written a prescription for RELYVRIO in the fourth quarter. So that continues to be our focus. *There's a lot of opportunity that remains in those top prescribers, but also a lot of patients are being seen by the general neurologists out in the communities, and that's clearly our next runway that we have to continue to penetrate this market much more broadly than we have to date*.

129.    During the 4Q/FY22 Earnings Call, an analyst asked about the rate at which patients were initiating treatment with Relyvrio, specifically, seeking "a sense for how we think about the pace of starts after" the first quarter of 2023, and whether to "expect this kind of 1300

patients per quarter to be kind of a sustainable rate or should we expect the pace of new starts to kind of start to decline thereafter." Defendant Olinger once again reassured investors, emphasizing the Company's belief in a "long runway" for continued growth:

> ***So we just want to reiterate, we are very pleased with the growth we're seeing in the second, in Q4 of 2022 and so far this year. And we are -- and things are going really well. We're seeing an initial bolus in demand. And to be honest with you, we just don't know how big this bolus will be or how long it will last. But we expect continued growth and interest in demand as the initial prescribing has been relatively concentrated as I mentioned. We have a large untapped opportunity to build on in our ongoing outreach and education and efforts. We really see that we have a lot of runway ahead of us.***

130.    Defendant Klee chimed in to provide his own response to the question, stating, in relevant part:

> [A]nd just one more point, as [Defendant Olinger] emphasized the demand, I think that's on the plus side, right? ***We're seeing early demand. It's very concentrated so far so we have a lot of breadth and depth to continue to look forward to, I think as we expand this product.***

131.    Similarly, in response to an analyst's question about "what the launch curve might look like with an initial bolus and then steadying out until we get to steady state," and how the Individual Defendants were "thinking about it now that [they]'re in the market and seeing the demand [they]'ve had thus far," Defendant Olinger once again praised the progress of the launch and expressed continued optimism about the Company's ability to grow its subscriber base moving forward:

> [I]n terms of the slope of the ramp, to your point, it is very early months of the launch, ***but we are seeing very encouraged levels of interest from both people living with ALS and clinicians*** and we said that Q4, we ended with 13 [later changed by the Company to "1300"] people on therapy. We expect to double that by the end of Q1. And again, I just want to reiterate ***everybody that is on a net basis, which should give you a good sense of how the launch is progressing***. And while we do have that initial bolus of demand, we don't know how big and how long that will last, ***we do really are very confident in the long runway we have ahead of us***.

So our focus remains on the 1,300 patients that are on therapy today **and keeping them on therapy**. And then also, we're very encouraged by the insurance favorability that we're seeing, while it's only a third at this point we have very broad access to date, and we're encouraged at the future.

**March 13, 2023 Form 10-K**

132.    On Mach 13, 2023, the Company filed its annual report on Form 10-K with the SEC, reporting its financial and operational results for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Cohen, Klee, Frates, Milne, Fonteyne, and Quimi.

133.    Regarding the commercialization of Relyvrio (AMX0035), the 2022 10-K stated, in relevant part:

> Since obtaining regulatory approval, **we have seen strong interest in AMX0035, and we are encouraged by the early success of our commercial launch**.
>
> * * *
>
> **When shown a target product profile for AMX0035, the majority of ALS specialists and neurologists with whom we spoke are open to utilizing it in early-to-mid-stage patients, with some also stating the potential for use in late-stage patients.**

134.    Also, regarding the Company's strategy to "[e]ffectively and efficiently commercializ[e] RELYVRIO for ALS in adults in the U.S," the 2022 10-K touted the Company's "**commercial** capabilities, coupled with our understanding of the ALS patient and medical community," as a key element that "**will enable us to successfully commercialize RELYVRIO** for ALS in the U.S." The 2022 10-K also stated that as the Company "**begin[s] to commercialize RELYVRIO in the U.S. . . . and learn more about market dynamics . . . our view of our products' initial potential market opportunity will become more refined**."

135.    The 2022 10-K also included disclosures under Item 7, which incorporates the requirements of Item 303 of Regulation S-K [17 C.F.R. § 229.303], titled "Management's

Discussion and Analysis of Financial Condition and Results of Operations," specifically addressing the launch of Relyvrio:

> The successful development and commercialization of AMX0035 [Relyvrio] and any future product candidates is highly uncertain, due to the numerous risks and uncertainties associated with product development and commercialization, including the following:
>
> - the timing and progress of preclinical and clinical development activities;
>
> - the number and scope of preclinical and clinical trials for separate indications we decide to pursue;
>
> - raising necessary additional funds;
>
> - the progress of the development efforts of parties with whom we may enter into collaboration arrangements;
>
> - our ability to maintain our current development activities and to establish new ones;
>
> - our ability to establish new licensing or collaboration arrangements;
>
> - the successful initiation and completion of clinical trials with safety, tolerability and efficacy profiles that are satisfactory to Health Canada, the FDA or the EMA, or any other comparable foreign regulatory authority;
>
> - the receipt and related terms of regulatory approvals from applicable regulatory authorities, including our marketing authorization with conditions from Health Canada for ALBRIOZA and the post-marketing requirements from the FDA for RELYVRIO;
>
> - the availability of drug substance and drug product for use in production of AMX0035;
>
> - establishing and maintaining agreements with third-party manufacturers for clinical supply for our clinical trials and commercial manufacturing;
>
> - our ability to obtain and maintain patents, trade secret protection and regulatory exclusivity, both in the U.S. and internationally;
>
> - our ability to protect our rights in our intellectual property portfolio;
>
> - the commercialization in Canada and the U.S. of AMX0035 (known as ALBRIOZA in Canada and RELYVRIO in the U.S.) and in other potential jurisdictions, if and when approved;

- obtaining and maintaining third-party insurance coverage and adequate reimbursement;

- the acceptance of AMX0035, if approved, by patients, the medical community and third-party payors;

- competition with other product; and

- a continued acceptable safety profile of our therapies in pre-approval market access programs or in commercial access following approval.

A change in the outcome of any of these variables with respect to the development of AMX0035 or any future product candidates could have a significant impact on the cost and timing associated with the development of our product candidates. We may never succeed in obtaining or maintaining regulatory approval for AMX0035 or any future product candidates.

136.    Attached as exhibits to the 2022 10-K were certifications signed by Defendants Cohen, Klee, and Frates pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" the filing. They further certified that "the financial statements, and other financial information included in [the 2022 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of [Amylyx] as of, and for, the periods presented in" the 2022 10-K.

### *April 18, 2023 Virtual Conference*

137.    On April 18, 2023, Defendant Cohen attended a virtual conference to address Relyvrio. An attendee asked about the "first launch quarter of sales, [of a] very encouraging start" and to "talk[] through some of the metrics that you're looking for in terms of building upon this strong first quarter" and "how you expect these things to kind of evolve and continue to build over the course of 2023?" Defendant Cohen answered:

*We had roughly 1,300 patients on drug at the end of the year. By the end of this quarter, we expect to roughly double that. And we believe most of that was fairly concentrated prescribing from some of the very specialty centers. We believe there's a lot more to educate to a lot more people to bring onboard those potential prescribers to keep growing that*.

And I'll say it too, it feels like it's been – we've been out there for a while, but launch was only pretty recently. Until there's only been so much time for all these sites to get on board. So*, I think there's even a lot of potential still at some of the sites that have had just started by the time of the fourth quarter or the first quarter, still a lot more patients to get on…*

Quite interestingly, we've just seen very broad -- at least as of last report, *we've seen very broad prescribing with people, both w*ho *are very recently diagnosed and people who have had the disease more than three years. So, I think, again, we continue to see a pretty broad base for who's taking RELYVRIO and getting prescribed that*.

### May 11, 2023 Press Release and Earnings Call

138.    On May 11, 2023, the Company issued a press release announcing its first quarter 2023 financial results (the "1Q23 Press Release"). In the 1Q23 Press Release, Defendant Cohen stated:

> During [Q1], we made significant progress on our commercial launches of RELYVRIO in the U.S. . . . as we advanced our goal of ensuring efficient access for every eligible person living with ALS. *We continue to see strong engagement and interest from physicians and the ALS community* and are encouraged that the vast majority of payors who have published formal policy decisions are providing broad access to RELYVRIO.

139.    That same day, Amylyx held an earnings call to discuss the first quarter 2023 financial results (the "1Q23 Earnings Call"). On Defendant Klee's scripted portion of the 1Q23 Earnings Call, he stated, in relevant part:

> *In [Q1], we saw a continued high level of interest from the ALS community* and RELYVRIO broadened insurance coverage, and high levels of engagement with our Amylyx care team, also known as act, just two quarters into launch over 10% of the approximately 29,000 people living with ALS in the US are now on RELYVRIO. *Even with that success in our first six months, we have more to do*. There remain many more 1000s of people living with ALS in the US and at least

200,000 people living with ALS globally. ***We are still in the early stages of our journey, and our team remains hard at work.***

* * *

***Our commercial ramp in the U.S. . . . is proceeding very well*** . . . . And we achieved our first quarter of profitability in just the second quarter of our commercial launch in the U.S.

140.     Likewise, Defendant Frates stated on the 1Q23 Earnings Call, in relevant part:

***We're encouraged by the strong interest in demand we continue to see from the ALS community.*** From a financial point of view, our business [is] strong. Net product revenue were $71.4 million for the quarter, compared to net product revenue of $21.9 million for the fourth quarter of 2022 with the vast majority of that revenue from the [U.S.]

* * *

I want to pause a moment on our overall financial results ***with the strong demand for RELYVRIO driving near term profitability ahead of our expectations***. ***We want to reiterate our long term financial goals driving top line revenues as RELYVRIO become standard of care, growing profitability for our investors, and investing in a pipeline that has the potential to provide much needed treatments for neurodegenerative diseases. We're well-positioned to build a profitable financially strong organization for the long term*** . . . . ***We're currently in a position to fund the programs, we discussed it without the need to raise additional capital***.

141.     In relevant part, Defendant Olinger reiterated these statements:

***We are seeing continued interest and demand for RELYVRIO.*** As of March 31, there were roughly 3000 people on RELYVRIO in the US more than double the number of people on RELYVRIO at the start of the quarter. We are pleased that this many people have gained access to our important treatment.

I think it's worth spending a minute to provide some additional context on the strength of our launch. While we knew there was pent up demand, ***the fourth quarter and first quarter, were still well ahead of our expectations***. The rate of net patient's [indiscernible] has begun to moderate as expected. ***However, we still see significant demand for people living with ALS, and physicians alike. Importantly, we still have plenty of room for growth, both at the top ALS centers, and the broader neurology community***.

Now, let me run through a few metrics that show our progress, but also the growth opportunities ahead of us. By the end of the first quarter, approximately 65% of the

top 500 US prescribers and approximately 95% of the key ALS centers had prescribed RELYVRIO out to at least one person since launch. ***Prescribing remains fairly concentrated***, with roughly 80 prescribers mostly at major ALS centers, representing approximately half of all RELYVRIO prescriptions during the quarter. While we are encouraged with these data points, ***we see an opportunity for broader and deeper uptake of key ALS centers, and the opportunity to continue to penetrate the group of top prescribers.***

…"***[w]e continue to see a wide range of people living with ALS in terms of time sense initial diagnosis, interested in and gaining access to RELYVRIO.***"

142.    During the question-and-answer segment of the 1Q23 Earnings Call, an analyst inquired about the rate of pace of new patients for Relyvrio and second quarter expectations. In response, Defendant Olinger stated:

[W]e continue to be incredibly pleased with our launch today . . . . [*I]f I could just reiterate a few key points, we ended the quarter with roughly 3000 patients, again, double what we started with at the beginning of the quarter*.

***And that's about 10% of the 29,000 patients living with ALS. So not surprisingly, our net patient ads can't double forever***. So in Q2 we are expecting the number will be lower than what we delivered in Q4 and Q1. ***I think more importantly, we continue to see significant interest in demand for RELYVRIO*** both from patients and HCP. And ***we have a tremendous opportunity for us to grow both in depth and breadth at all the key ALS centers***[.]

143.    In the same vein, another analyst asked Defendant Olinger about "the rate of net patient ads . . . beginning to moderate" and whether the Individual Defendants could provide "updated views on how big this initial bolus of patients could be" and "how long it could last before [achieving] a steady state trajectory of new starts." Defendant Olinger replied:

***Regarding the bolus, it's really too early to tell when the bolus will finish. But what I can say is that we know in Q4 and in Q1, we did see that high level of demand due to the pent up demand that we had. And they were quite frankly, even ahead of our expectations. So we have begun to see the rate and new patient ads moderate. But again, I want to reiterate, we have a tremendous opportunity for growth, because even within the key accounts that we penetrated***. And just remind you of some of the metrics, we said 95% of all the key ALS centers have prescribed for at least one patient every account, you see one account, you see one account. It's typical rare disease. So some accounts are highly penetrated. ***And some accounts have a great deal of room ahead of us to penetrate. And we really***

*have just started to get out into the broader neurology community. So again, we see tremendous growth ahead of us to serve all the remaining patients that are depending on us.*

144.    In response to another analyst question during the 1Q23 Earnings Call about "what you're seeing in terms of start forms versus net adds," the trend the Individual Defendants were observing, and whether they could provide "any color on duration of therapy so far or any dropouts that you're seeing," Defendant Klee largely avoided directly answering and stated:

So we're not providing any guidance on the number of patients for the quarter again, I'll just go back to, we think our net patient adds, they can't double forever. So we'll be lower in Q2 than we've been able to deliver in Q4, Q1 because we believe that was the initial pent up demand. ***Again, we don't know, when that bolus will be over. So it's hard for us to really give any guidance on that. In terms of duration of treatment, it's really too early in the launch to give that I mean, the first patients who started on therapy, we're basically at the end of October, beginning of November. So they really haven't been on therapy long enough for us to give, any, any clarification there. In terms of discontinuation rates, that's sort of similar as well. People just haven't been on therapy long enough***…

***May 11, 2023 Form 10-Q***

145.    On May 11, 2023, the Company also filed its quarterly report on Form 10-Q with the SEC to report its financial results for the first quarter ended March 31, 2023 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Cohen and Frates and attached SOX certifications signed by Defendants Cohen, Klee, and Frates attesting that the 1Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" the filing. They further certified that "the financial statements, and other financial information included in [the 1Q23 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of [Amylyx] as of, and for, the periods presented in" the 1Q23 10-Q.

146.    The 1Q23 10-Q included the same statements referenced in ¶¶ 133-135 above, assuring investors that the Company's understanding of Relyvrio's commercial prospects, including, its prescription rate, would improve over time, and that investors could rely on the Individual Defendants representations regarding Relyvrio's commercial outlook and prescription trends.

### August 10, 2023 Press Release and Earnings Call

147.    On August 10, 2023, the Company released a press release announcing its financial results for the second quarter of 2023 (the "2Q23 Press Release"). In relevant part, the 2Q23 Press Release quote Defendants Cohen and Klee as stating, "*[w]e made strong and steady progress on our commercial launches in [Q2]*, supporting people living with ALS with increased access to RELYVRIO."

148.    The same day, the Company held an earnings call with analysts and investors to discuss these financial results (the "2Q23 Earnings Call"). During the scripted portion of the 2Q23 Earnings Call, Defendant Klee stated the following, in relevant part:

> *In [Q2], we made significant progress in bringing RELYVRIO . . . to people with ALS in the US[.]*
>
> * * *
>
> Let me walk you through our progress. *Our commercial organization is off to a strong start . . . as evidenced by the strong and steady demand we saw in [Q2].* As of June 30, 2023, there were roughly 3,800 people on RELYVRIO in the US, up from roughly 3,000 people on RELYVRIO as of March 31, 2023 and just over 1,300 at the end of 2022.

149.    Also during the scripted portion of the 2Q23 Earnings Call, Defendant Frates stated the following, in relevant part:

> *We're encouraged by the strong interest and demand we continue to see from the ALS community in the second quarter. From a financial point of view, our business remains strong.*

Net product revenues were $98.2 million for the quarter, compared to net product revenue of $71.4 million for the first quarter of 2023, with the vast majority of that revenue coming from the [U.S.].

150.    Also, during Defendant Olinger's scripted remarks on the 2Q23 Earnings Call, she stated, in relevant part:

> *During [Q2], interest in and demand for RELYVRIO continued to build at a steady pace from both those that are newly diagnosed and people who have been living with ALS for years*.
>
> * * *
>
> Now, let me run through a few key metrics that demonstrate our progress and growth opportunities ahead of us. *Prescribing remains fairly concentrated with just over 80 prescribers mostly at major ALS centers representing approximately half of all RELYVRIO prescriptions at the end of the quarter.*
>
> *We are encouraged by the level of interest among this group and believe that we have an opportunity for growth as we bring our message to more prescribers and deepen our relationships within these key ALS centers*.

151.    On the question-and-answer segment of the 2Q23 Earnings Call, an analyst inquired "what are you seeing with respect to . . . discontinuation rates" and whether the Individual Defendants "[a]re . . . seeing any emerging trends with respect to the primary reason for discontinuation." Defendant Olinger responded, stating:

> [A]s a reminder, we report on net patients on therapy. So this is inclusive of any discontinuation. We are really pleased with our ability to serve the roughly 3,800 net patients on RELYVRIO at the end of Q2. *I would say it's really too early to see any long-term trends at this point in our launch.*

152.    Similarly, when asked by an analyst whether the Individual Defendants "have any better sense of the size of the patient bolus at this point" and the discontinuation rates, specifically "among the early patients t[hat] have received [the] commercial drug in 4Q of last year [who are] presumably some of the[] patients . . . would have been on drug for at least six months now," and whether the Individual Defendants could "provide any color as to what percent of them are still on

therapy at this point again just among the patients who started in 4Q," Defendant Olinger largely

avoided providing a direct answer, stating:

> ***Maybe I'll just start with your question regarding the bolus. We continue to be pleased that the interest in and demand for RELYVRIO, continues to be as at a very strong pace and I think importantly includes a mix of both newly diagnosed patients and people who have been diagnosed and living with ALS for many years***.
>
> Again at the end of Q2, we had roughly 3,800 net patients on therapy up from roughly 3,000 patients in Q1 and just over 1,300 in Q4. ***So we really believe that at this point in time RELYVRIO is really starting to become a foundational therapy in ALS and meeting a really high unmet need for this patient community*** which is obviously our mission and what we've been focused on for some time.
>
> As far as the growth opportunities which is equally important to us we see several different opportunities ahead of us. First ***the prescribing remains really concentrated*** with the 80 prescribers mostly at the major ALS centers where our focus was at the beginning of launch representing about half of all RELYVRIO prescriptions this quarter. ***We're also encouraged that the level of interest among this group and believe that we have a large opportunity for growth ahead of us.*** As we bring our messaging to more prescribers and deepen our relationships within those key centers. And I think importantly with those prescribers be much more prolific in their prescribing which I think is an important part.
>
> And second ***we have a really large untapped opportunity for growth outside of this group***. As I mentioned, we were heavily focused on the key ALS centers at launch. We're continuing to expand our outreach and educational efforts more broadly because we believe it's critically important that everybody is aware that RELYVRIO is the first-and-only product to have both function and survival demonstrated in the clinical trial and we believe we can change the paradigm of treatment moving forward. And maybe ***just to answer your second question on discontinuation, again, we're only going to be reporting on net patient numbers for a quarter. But indeed, I think it's important to reflect that the first cohort of patients who started on therapy at launch many of those who have been really fairly progressed early on. So I think we're going to see the dynamic of the patients change over time. So it's a little too early to really give any trends there.***

153.    Likewise, when asked a question regarding trends for the month of July, Defendant

Frates largely avoided a straight answer, stating:

> ***[I]n terms of July, I think we'll comment on the July trends when we report our quarterly results for Q3. But I think our business is -- with now three quarters***

*under our belt, we're all starting to get a chance to see what our business is like moving forward. But we won't be giving specifics on July at this stage.*

154.    Another analyst sought further insight during the 2Q23 Earnings Call. However,

Defendants Klee and Olinger once again largely sidestepped the question:

[Analyst]

Thanks so much. Congrats on the quarter. Just two questions. One maybe another way to ask a question that people seem to be trying to get at. Do you have any color on -- or can you provide any color on kind of new prescription trends versus refill trends? Any metrics you can provide there and how that's evolved?

\* \* \*

[Defendant Klee]

So I'll start and then have [Defendant Olinger] join in too. So again, we're three quarters into launch. We have roughly 3,800 net people on treatment as of the end of Q2 which we're very pleased about. I mean, that's 3,800 people with ALS we're helping. *But that means that there's many, many more people that we'd like to help as well.*

But I think we all here are constantly reminded of the mission at hand. And I think the ALS market in many ways is unique. And it's because it's a large rare disease, there's a huge unmet medical need. And historically there have been few treatment options.

And so I think the way that we've thought about our business, as Margaret was sharing, is to focus on the ALS specialists, and then continuing to look to broaden out. And so I think as we look at our prescription numbers, where our people have focused is where we're seeing the prescriptions as well.

And then [Defendant Olinger], I'll invite you to share any more details on that.

[Defendant Olinger]

Yeah. As we've indicated heavily focused at launch which I think was the right strategic decision to focus on the key ALS centers where the majority of ALS patients are actually treated.

*However, there's also a number of ALS patients that are treated outside of ALS centers for multiple reasons, either they can't transport, they can't get there at a reasonable time and it's -- they typically need to go there every quarter to see the multidisciplinary care.*

*There are a number of General and Community Neurologist, that are equally important to be educated and that's where we're expanding our focus. And we are continuing to increase our penetration and reach out to those, what we call our Tier A or B targets.*

And we're just going to continue to work on that expansion moving forward, because it's really important for us that every physician who treats an ALS patient is educated about the significant RELYVRIO benefits that we can bring to be able to serve this patient community optimally.

### August 10, 2023 Form 10-Q

155.    On August 10, 2023, the Company filed its quarterly report on Form 10-Q with the SEC, reporting its financial and operational results quarter ended June 30, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendants Cohen and Frates and attached SOX certifications signed by Defendants Cohen, Klee, and Frates attesting that the 2Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" the filing. They further certified that "the financial statements, and other financial information included in [the 2Q23 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of [Amylyx] as of, and for, the periods presented in" the 2Q23 10-Q.

156.    The 2Q23 10-Q repeated the same statements referenced in ¶¶ 133-135 above, assuring investors that the Individual Defendants' understanding of Relyvrio's commercial prospects, including its prescription trends, would become more accurate over time. As a result, investors were led to believe they could rely on the Individual Defendants' representations regarding Relyvrio's commercial outlook and prescription rate.

157.    The statements referenced in ¶¶117-156 above were materially false and misleading because they failed to disclose material adverse facts about Amylyx's business, operations, and

prospects. Specifically, the Individual Defendants made false and/or misleading statements which failed to disclose, *inter alia*, that: (1)  that the purported "significant demand" for the drug was driven by an initial, temporary surge of patients that had already stabilized, thereby eliminating any realistic prospect for continued growth; (2) within months of Relyvrio's launch, this initial surge had already subsided; (3) accordingly, there was no meaningful growth potential among newly diagnosed ALS patients within ALS treatment centers; (4) there was no viable opportunity for expansion beyond these specialized centers into the broader neurology community; (5) at the same time, Relyvrio was experiencing high, undisclosed discontinuation rates, which materially undermined the drug's commercial viability; and (6) those undisclosed discontinuations had artificially inflated the perceived "runway" for acquiring new net patient starts. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

158.    The truth emerged on November 9, 2023, when, before the market opened, Amylyx issued a press release announcing its financial results for the third quarter of 2023, reporting GAAP EPS of $0.30, falling short of consensus estimates by $0.12.

159.    Later that day, during a conference call with investors and analysts to discuss the results (the "3Q23 Earnings Call"), Defendant Olinger disclosed that, despite a purportedly consistent rate of new prescriptions for Relyvrio during the quarter, patients were discontinuing the treatment after approximately six months. He stated, in relevant part:

> [W]e saw a steady cadence of new prescriptions written in the third quarter . . . . As we think about how our growth has evolved this year, ***the slowdown in net adds this quarter was primarily driven by increased discontinuations for a variety of reasons***.

*  *  *

54

60% of people taking RELYVRIO remain on therapy six months after initiation in the U.S. We believe some discontinuations are addressable[.]

160.    Also on the 3Q23 Earnings Call, Defendant Frates confirmed that "[o]ur rates were impacted by a number of factors," including "what [Defendant Olinger] mentioned earlier." Defendant Frates was referring to patients discontinuing Relyvrio treatment at an increased rate and a stagnating patient registration.

161.    During trading hours on November 9, 2023, *Investor's Business Daily* published the *IBD* Article, addressing Amylyx's financial results, entitled "Anylyx Crashes 27% As New ALS Drug Faces a Barrage of Troubles." The *IBD* Article stated, in relevant part:

Amylyx . . . meaningfully missed Wall Street's expectations on Thursday amid struggles with its [ALS] drug. AMLX stock crashed in morning trades.

\* \* \*

Amylyx noted patients are dropping off Relyvrio treatment after six months, Evercore ISI analyst Michael DiFiore said in a report. But Amylyx said the number of new patients starting treatment was "steady." DiFiore says his math suggests otherwise.

He also noted Amylyx blocked analysts from seeing Relyvrio prescription data this summer.

"Knowing that stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier," he said. "Stock move today in a bad biotech tape and fund performance doesn't help investor confidence among folks that have held onto the stock."

In midday trades on today's stock market, AMLX stock plummeted 27.2% near 13.10.

AMLX Stock: Wide Sales, Earnings Misses

Overall, Relyvrio generated $102.7 million in sales. Though sales grew almost 5% sequentially, they missed analysts' forecasts, which ranged from $108.5 million to $113.8 million, Mizuho Securities analyst Graig Suvannavejh said in a report.

\* \* \*

Evercore's DiFiore says AMLX stock analysts' views for 2024 will "need to come down meaningfully." Analysts currently project $591 million in U.S. sales of Relyvrio. But he says $500 million is closer to what the Street should expect.

"I assume discontinuation rate at month six slows a bit — but not majorly," he said. "New adds improves a bit — but not majorly. Net price per patient stays flat."

162.    On a November 11, 2023 Earnings Call, investors sought clarification on the recent news. During the question-and-answer portion, one investor asked:

"If I just look at the fact pattern on how you implemented the data restriction on IMS and Symphony vendors this summer and how that coincided with this massive slowdown, it just really puzzles me because I feel like not only was the Street ready from communication on your end, but also I feel like you limited the channels to which Street could have been ready for today. How do you -- can you expand on that? Because it looks like you may have had a sense for discontinuations really picking up around July timeframe."

163.    Defendant Cohen avoided directly addressing the timeline in question, instead stating that "our intention at launch was always to have the limited distribution model," and adding that "we updated everyone in February that we believed we had identified one of the areas where data was emerging, and that we had addressed it." He further stated, "I think the most important thing here, though, is that we have significant long-term growth opportunities ahead of us."

164.    On the same call, an analysts inquired:

[I]f I model out on discontinuations, what I feel is it's not just the discontinuation. It's also the new starts might have dropped about 35%, 40% quarter-over-quarter from 2Q to 3Q. Is that right? Because I feel like you may have had about, I don't know, 750 discontinuations in 3Q. But if that's the case, you might be in for another about 650 to 700 discontinuations in 4Q, which makes it very hard to again put up a very meaningful net add number in 4Q unless your new add picks up very meaningfully versus where it was in 3Q. Am I on the right track there?

165.    In terms of the accusations, Defendant Cohen did not respond. However, he did state that "[m]aybe we haven't commented on any of those metrics, but maybe just to circle back. There are roughly 30,000 people living with ALS in the United States. We have 3,900 in therapy. So we certainly see an opportunity to continue to grow."

56

166. On this news, the Company's stock price fell $4.74 per share, or approximately 31.9%, from a closing price of $18.00 per share on November 8, 2023, to close at $12.26 per share on November 9, 2023.

**Subsequent Developments**

167. On December 7, 2023—less than a month after the disclosure of the truth concerning Relyvrio's commercial prospects and prescription rates—Amylyx announced that Defendant Olinger would be stepping down from her role as Chief Commercial Officer, effective December 31, 2023. While no reason was provided for her departure, Defendant Olinger, as CCO, had primary responsibility for overseeing Relyvrio's commercial development throughout the Relevant Period.

168. Amylx issued a press release on March 8, 2024 revealing that Phase III of the Phoenix Study failed "to meet its primary endpoint of reaching statistical significance (p=0.667) as measured by change from baseline in the Revised Amyotrophic Lateral Sclerosis Functional Rating Scale (ALSFRS-R) total score at Week 48, nor was there statistical significance seen in secondary endpoints." Therefore, Relyvrio made no difference in slowing the progression of ALS or helping patients perform daily tasks.

169. As a result, the March 8, 2024 press release stated that the Company "voluntarily decided to pause promotion of the medication during this time" and indicated it was considering a "voluntary withdrawal" from the market. During a webcast that same day, Defendant Cohen advised on the Company's plan to understand the outcome with regulators and ALS community members. When analysts inquired about the factors contributing to the Phoenix trial failure, Defendant Cohen declined to provide details.

170.    Investors reacted sharply to the news of the Phoenix Study failure as Amylyx's stock closed 82% lower following the announcement. Seemingly, the sharp decline signaled that investors believed the drug's value had fallen to nearly zero, or possibly less when ongoing associated expenses were considered. The Phoenix Study results were characterized by the *Wall Street Journal* as potentially delivering a "death blow" to Relyvrio and raised serious concerns about both the drug's future and the viability of the Company itself.

171.    On April 4, 2024, speculation regarding the future of Amylyx and Relyvrio was partially resolved when the Company officially confirmed its decision to "voluntarily withdraw" Relyvrio from the market. In a press release, it was announced that announced the Company had "started a process with the [FDA] . . . to voluntarily discontinue the marketing authorizations for [Relyvrio] . . . and remove the product from the market in the U.S. and Canada based on topline results from the Phase 3 PHOENIX trial." Thus, Relyvrio was no longer available to patients as of that day.

172.    The April 4, 2024 press release represented that this led to a "restructuring to focus the Company's financial resources on upcoming clinical milestones" related to non-ALS indications. The Company also announced that it would "reduce its workforce by approximately 70% and decrease external financial commitments outside of its priority areas."

173.    In the same release, Amylyx stated that it would "continue to evaluate and share learnings from PHOENIX to help inform future ALS research" and that "[t]opline data from PHOENIX will be presented at the American Academy of Neurology (AAN) Annual Meeting in Denver and online, taking place April 13–18, 2024." The Company noted that the presentation was scheduled for April 16, 2024, during the Clinical Trials Plenary Session (9:15 a.m. – 11:30 a.m.

MT), and would be made available on the "Publications and Presentations" section of its website following the session.

174.    However, since the end of 2024, the Company has not provided any information to the public on why the Phoenix Study failed.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

175.    Throughout the Relevant Period, the Individual Defendants had the motive and opportunity to commit fraud. Further, the Individual Defendants knew or should have known that their statements were false and misleading. As such, the Individual Defendants participated in a scheme to defraud and participated in practices and acts intended to fraud or deceive securities purchasers during the Relevant Period.

176.    During the Relevant Period, while in possession of material, non-public information and simultaneously disseminating materially false and misleading statements, causing the Company's securities prices to artificially inflate, Defendants Klee, Cohen, Olinger, Frates, and Hofmann sold a total of 316,997 shares of Amylyx common stock for total proceeds of over $10.1 million. FE2 added: "When you see mass amounts of stock being liquidated by the CEOs, the CFO, and the COO, and God knows who else because we didn't get information about [Defendant Olinger's] direct reports, but we knew they were also liquidating, we were like what do they know if they're liquidating? And why are they liquidating if they keep on telling us that the Phoenix trial is looking good?"

177.    Also, the Individual Defendants either knew or were deliberately indifferent to the sharp decline in new patient subscriptions and the high rate of early discontinuations, factors that significantly overstated the drug's growth potential beyond the initial bolus of patients. According to former employees, the Individual Defendants actively monitored new subscriber trends and

were fully aware that demand had dropped off within just a few months of the October 24, 2022 launch. For example, according to FE1, management was fully aware of the stagnation: "Data is data. They knew everything was flat. I grew my territory 170%. If mine is flat, so is every other territory." FE1 confirmed that management knew about the numbers of new patient subscriptions because FE1 worked alongside reimbursement managers, who had access to a database to track them in real time. A notification, or lack thereof, indicates that the Company had access to information on what patients were starting and at what time.

178.    FE1 directly warned management about this issue on a call with Defendants Klee and Cohen around the fourth quarter of 2022. According to FE1, Defendants Cohen and Klee inquired about the potential for growth in different geographies with general neurologists. FE1 recalled that they were vocal about the reality of the situation—that general neurologists are a "dead end."

179.    Further, FE2 confirms that the prescriber base did not significantly expand during the launch, and this information was known within the Company. After the initial launch in late 2022, "Jim Frates right hand guy in finance tells us what the [2023 sales] forecast is and what goals are going to be" and that the forecast was "front loaded for the first quarter," and that he "wanted them to get more than half of the business in the first quarter of 2023." FE2 asked if the Company's goals would decrease incrementally for the rest of the year, and Defendant Frates's finance colleague confirmed.

180.    Despite this, the Individual Defendants continued to publicly suggest that Relyvrio offered substantial untapped growth. Given their experience with ALS and its treatment landscape, they would have known there was little to no room for expansion among ALS centers, newly

diagnosed patients, or general neurologists. If sales representatives were aware of these limitations, it is implausible that senior management was not.

181.    The Individual Defendants concealed critical data regarding new patient subscriptions and discontinuation rates throughout Relyvrio's commercial launch. In the summer of 2023, Amylyx ceased reporting new patient subscription figures to market research firms IQVIA and Symphony. Despite the fact that discontinuation rates were essential to accurately assess true demand and growth potential, and that the Company was tracking these figures in real time, the Individual Defendants repeatedly claimed they could neither identify trends nor share the data. However, FEs reported that many patients were discontinuing treatment just weeks after initiation, even during the initial surge in demand. For example, FE1 explained that management tracked discontinuations in near real time through reimbursement managers, who monitored the date of a patient's last shipment and followed up directly if refills lapsed. Additionally, internal efforts were underway to address the gastrointestinal side effects, driving many discontinuations, including training medical science liaisons on how to intervene when patients considered stopping treatment. Therefore, management was aware of and responding to early attrition long before it was publicly disclosed.

182.    Efforts to address early patient discontinuations were frequently discussed on regional conference calls, according to FE1. In response, Amylyx created a PDF guide for providers on how to manage these side effects and recommended supportive medications. Beyond side effects, many patients chose to discontinue Relyvrio because they saw no clinical improvement. As FE2 noted, if patients were still deteriorating and experiencing harsh symptoms, "it wasn't worth" staying on the drug. Despite this, sales and medical staff were told to stay focused on promoting Relyvrio.

183.    The Individual Defendants took intentional steps to withhold this information from the public, including repeatedly deflecting investor questions and limiting external visibility by employing a "closed" pharmacy network. This prevented analysts from conducting independent assessments. Internally, the Individual Defendants further obscured the truth by refusing to provide sales teams with national-level data on subscriber counts and discontinuations, hindering employees' understanding of actual growth potential and program performance.

184.    At the same time, while the Individual Defendants privately acknowledged that sales were falling short of internal projections, they publicly portrayed the launch as stable and successful. According to FEs, there was a stark disconnect between the optimistic public narrative and the internal reality—where leadership was increasingly alarmed over unmet sales quotas. This internal pressure gave rise to a toxic work environment characterized by desperation and ethically questionable efforts to boost numbers at any cost.

185.    Developments after the Relevant Period further support a strong inference of knowlege. Amylyx's eventual decision to withdraw Relyvrio from the market underscores that the Individual Defendants were aware, throughout the commercial launch, that the drug lacked sustainable long-term growth potential. Additionally, although the Company publicly committed to sharing data from the failed Phoenix Study and presenting it at a scheduled medical conference, it has yet to release any meaningful information or attend the promised presentation. The abrupt departure of Defendant Olinger shortly after the negative revelations emerged also suggests potential executive-level misconduct in connection with the launch and commercial trajectory of Relyvrio. FEs have further described a corporate culture characterized by finger-pointing and denial, allegedly used to obscure the real reasons behind stagnant sales, contrary to the optimistic outlook shared with the market.

186.    The Individual Defendants either knew or were deliberately reckless with respect to the data on new subscribers and patient discontinuations, given that Relyvrio's commercial performance was central to Amylyx's business. As the Company's flagship, and only, commercially approved product in the U.S., Relyvrio's success or failure directly determined Amylyx's viability. This was starkly illustrated when the Phoenix Study results showed no statistically significant benefit, triggering an 82% collapse in Amylyx's stock price and prompting a major corporate restructuring, including a 70% workforce reduction. In light of these high stakes, the Individual Defendants either knew or should have known about the negative indicators regarding Relyvrio's short-term and long-term commercial prospects.

## DAMAGES TO AMYLYX

187.    As a direct and proximate result of the Individual Defendants' conduct, Amylyx will lose and expend, many millions of dollars.

188.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

189.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

190.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

191.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

192.    As a direct and proximate result of the Individual Defendants' conduct, Amylyx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

193.    Plaintiff brings this action derivatively and for the benefit of Amylyx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Amylyx, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

194.    Amylyx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

195.    Plaintiff is, and has been at all relevant times, a shareholder of Amylyx. Plaintiff will adequately and fairly represent the interests of Amylyx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

196.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

197.    A pre-suit demand on the Board of Amylyx is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Cohen, Klee, Firestone, Milne, Fonteyne, and Quimi (the "Director-Defendants") and non-party Bernhardt Zeiher (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

198.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

199.    As Board members of Amylyx charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Amylyx, the Director-Defendants must have been aware of the material facts regarding the issues related to Amylyx's Relyvrio commercial launch. Moreover, Defendants Milne, Quimi, and Fonteyne have extensive experience in the pharmaceutical industry, meaning they had even more reason to be aware that there were issues with the Company's Relyvrio commercial launch. For example, the 2025 Proxy Statement stated that: (1) Defendant Milne has "over 30 years of

experience in pharmaceutical research and product development," including over 20 years of experience as a board member multiple biopharmaceutical companies; (2) Defendant Quimi has "more than 25 years of executive experience in the pharmaceutical and biotechnology industries" with expertise in global finance operations and rare disease drug commercialization; and (3) Defendant Fonteyne "has served on the boards of directors of Apnimed Pharmaceuticals, a clinical-stage pharmaceutical company, since October 2023, Apellis Pharmaceuticals, a biotechnology company, since April 2020, Corium, LLC, a private commercial-stage biopharmaceutical company, since August 2024, DalCor, Inc., a pharmaceutical company, since 2019, and Ypsomed AG, a biotechnology company, since 2018." For these reasons, too, demand on the Director-Defendants is futile.

200.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Amylyx to issue materially false and misleading statements. Specifically, the Director-Defendants caused Amylyx to issue false and misleading statements which were intended to make Amylyx appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

201.    Additional reasons that demand on Defendant Cohen is futile follow. Defendant Cohen co-founded Amylyx in 2013 and has served as the Company's Co-CEO and as a Company director since 2014. As such, the Company provides Defendant Cohen with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant

Cohen was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including those statements which he personally made. In addition, he also signed the false and misleading 2022 10-K, 1Q23 10-Q, and 2Q23 10-Q as well as accompanying SOX certifications attesting to its accuracy. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Cohen's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Moreover, Defendant Cohen is a defendant in the Securities Class Action. For these reasons, too, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Klee is futile follow. Defendant Klee co-founded Amylyx in 2013 and has served as the Company's Co-CEO and as a Company director since 2014. As such, the Company provides Defendant Klee with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Klee was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including those statements which he personally made. In addition, he also signed the false and misleading 2022 10-K as well as accompanying SOX certifications attesting to its accuracy. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Klee's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Moreover, Defendant Klee is a defendant in the Securities Class Action. For these reasons, too, Defendant Klee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Firestone is futile follow. Defendant Firestone has served as a Company director since March 2023 and also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Firestone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Milne is futile follow. Defendant Milne has served as a Company director since 2015 and as Chairman of the Board since 2021. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee, Science and Technology Committee, and Audit Committee. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading 2022 10-K. Moreover, Defendant Milne's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. For these reasons, Defendant Milne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Fonteyne is futile follow. Defendant Fonteyne has served as a Company director since March 2021. He also serves as Chair of the Compensation Committee and as a member of the Science and Technology Committee. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading 2022 10-K. For these reasons, Defendant Fonteyne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Quimi is futile follow. Defendant Quimi has served as a Company director since June 2021. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also signed the false and misleading 2022 10-K. For these reasons, Defendant Quimi breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

207.    Additional reasons that demand on the Board is futile follow.

208.    Defendants Quimi, Firestone, and Milne (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

209.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

210.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

211.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

212.   The acts complained of herein constitute violations of fiduciary duties owed by Amylyx's officers and directors, and these acts are incapable of ratification.

213.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Amylyx. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter

alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Amylyx, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

214.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Amylyx to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

215.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**
**Against the Individual Defendants for Breach of Fiduciary Duties**

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Amylyx's business and affairs.

218.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Amylyx.

220.    In breach of their fiduciary duties owed to Amylyx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1)  that the purported "significant demand" for the drug was driven by an initial, temporary surge of patients that had already stabilized, thereby eliminating any realistic prospect for continued growth; (2) within months of Relyvrio's launch, this initial surge had already subsided; (3) accordingly, there was no meaningful growth potential among newly diagnosed ALS patients within ALS treatment centers; (4) there was no viable opportunity for expansion beyond these specialized centers into the broader neurology community; (5) at the same time, Relyvrio was experiencing high, undisclosed discontinuation rates, which materially undermined the drug's commercial viability; and (6) those undisclosed discontinuations had artificially inflated the perceived "runway" for acquiring new net patient starts. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

221.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

222.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

223.    Moreover, five of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***approximately $10.1 million***.

224.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Amylyx's securities.

225.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price Amylyx's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

226.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amylyx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228.    Plaintiff, on behalf of Amylyx, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Amylyx.

231.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Amylyx that was tied to the performance or artificially inflated valuation of Amylyx, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

232.    Plaintiff, as a shareholder and a representative of Amylyx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

233.    Plaintiff, on behalf of Amylyx, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

234.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Amylyx to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

236.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

237.     Plaintiff, on behalf of Amylyx, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

238.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Amylyx in a manner consistent with the operations of a publicly held corporation.

240.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Amylyx has sustained and will continue to sustain significant damages.

241.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

242.    Plaintiff, on behalf of Amylyx, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Amylyx, for which they are legally responsible.

245.    As a direct and proximate result of the Individual Defendants' abuse of control, Amylyx has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

246.    Plaintiff, on behalf of Amylyx, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Cohen, Klee, Frates, and Olinger for Contribution Under Sections 10(b) and 21D of the Exchange Act

247.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248.    Amylyx and Defendants Cohen, Klee, Frates, and Olinger are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Cohen's, Klee's, Frates's and Olinger's willful and/or reckless violations of their obligations as officers and/or directors of Amylyx.

249.    Defendants Cohen, Klee, Frates, and Olinger, because of their positions of control and authority as officers and/or directors of Amylyx, were able to and did, directly and/or

indirectly, exercise control over the business and corporate affairs of Amylyx, including the wrongful acts complained of herein and in the Securities Class Action.

250. Accordingly, Defendants Cohen, Klee, Frates, and Olinger are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

251. As such, Amylyx is entitled to receive all appropriate contribution or indemnification from Defendants Cohen, Klee, Frates, and Olinger.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Amylyx, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Amylyx;

(c) Determining and awarding to Amylyx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Amylyx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amylyx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Amylyx to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Amylyx restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 1, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/Elizabeth Donohoe*_____
Elizabeth Donohoe (BBO #716357)
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Younes Hassine, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30 __ day of June, 2025.

Signed by:

_Younes Hassine_
C7E89D3BFDC745C...

Younes Hassine